# EXHIBIT 1

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____ Allegheny _____ **County**

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | *TIME STAMP* |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- [ ] Complaint
- [x] Writ of Summons
- [ ] Transfer from Another Jurisdiction
- [ ] Petition
- [ ] Declaration of Taking

Lead Plaintiff's Name:
David Schaffner, Jr.

Lead Defendant's Name:
Bayer AG

Are money damages requested? [x] Yes  [ ] No

Dollar Amount Requested:
(check one)
- [ ] within arbitration limits
- [x] outside arbitration limits

Is this a *Class Action Suit*? [ ] Yes  [x] No

Is this an *MDJ Appeal*? [ ] Yes  [x] No

Name of Plaintiff/Appellant's Attorney:  Adrian Roe, Esq. and James K. Paulick, Esq.

- [ ] **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE.* If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [x] Product Liability *(does not include mass tort)*
- [ ] Slander/Libel/ Defamation
- [ ] Other:
_____
_____

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:
_____
_____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:
_____
_____

**CONTRACT** *(do not include Judgments)*
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
_____
_____
- [ ] Employment Dispute:
  Discrimination
- [ ] Employment Dispute: Other
_____
_____
- [ ] Other:
_____
_____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:
_____
_____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
_____
_____
- [ ] Zoning Board
- [ ] Other:
_____
_____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:
_____
_____

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| DAVID SCHAFFNER, Jr. and THERESA SUE SCHAFFNER, | ) ) ) | CIVIL DIVISION |
| | ) | NO. |
| Plaintiff, | ) ) | **PRAECIPE FOR WRIT OF SUMMONS** |
| v. | ) ) ) | |
| BAYER AG, MONSANTO CORPORATION and BFG SUPPLY CO. | ) ) | Filed on Behalf of Plaintiffs, David Schaffner, Jr. and Theresa Sue Schaffner |
| Defendants. | ) ) ) | Counsel of Record for This Party: |
| | ) ) | Adrian Roe, Esq. PA ID No. 61391 |
| | ) ) ) ) | Roe & Simon LLC 428 Boulevard of the Allies Pittsburgh, PA 15219 (412) 434-8187 |
| | ) ) ) | James Paulick, Esq. PA ID No. 307552 |
| | ) | Law Office of James Paulick, Esq. 1569 McFarland Road Pittsburgh, PA 15216 412-353-9454 |

**JURY TRIAL DEMANDED**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| DAVID SCHAFFNER, Jr. and THERESA SUE SCHAFFNER, | ) | Civil Division |
| | ) | |
| | ) | No. |
| Plaintiff, | ) | |
| | ) | CIVIL DIVISION DOCKET CODE 004 |
| | ) | |
| v. | ) | |
| | ) | |
| BAYER AG, MONSANTO CORPORATION and BFG SUPPLY CO. | ) | |
| | ) | |

*Defendants.*

## PRAECIPE FOR WRIT OF SUMMONS

TO:   The Department of Court Records

KINDLY issue a Writ of Summons against the Defendants, BAYER AG, MONSANTO CORPORATION and BFG SUPPLY COMPANY.

Respectfully submitted,

LAW OFFICE OF JAMES PAULICK, ESQ.

By _____
James K. Paulick, Esquire
Counsel for Plaintiff

DATE: 5/24/19

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| DAVID SCHAFFNER, Jr. and THERESA SUE SCHAFFNER,<br><br>      Plaintiff,<br><br>    v.<br><br>MONSANTO CORPORATION<br><br>      Defendant. | CIVIL DIVISION<br><br>NO. GD-19-007729<br><br>**COMPLAINT IN CIVIL ACTION** |

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL DIVISION

NO. GD-19-007729

**COMPLAINT IN CIVIL ACTION**

Filed on Behalf of Plaintiffs, David Schaffner, Jr. and Theresa Sue Schaffner

Counsel of Record for This Party:

Adrian Roe, Esq.
PA ID No. 61391

Roe & Simon LLC
428 Boulevard of the Allies
Suite 100
Pittsburgh, PA 15219
(412) 434-8187

James Paulick, Esq.
PA ID No. 307552

Law Office of James Paulick, Esq.
428 Boulevard of the Allies
Suite 100
Pittsburgh, PA 15219
412-353-9454

**JURY TRIAL DEMANDED**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| DAVID SCHAFFNER, Jr. and THERESA SUE SCHAFFNER, | ) Civil Division |
| | ) |
| | ) No. GD-19-007729 |
| Plaintiff, | ) |
| | ) CIVIL DIVISION DOCKET CODE 004 |
| v. | ) |
| | ) |
| MONSANTO CORPORATION | ) |
| | ) |
| *Defendant.* | ) |

## NOTICE TO DEFEND

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY AN ATTORNEY AND FILING IN WRITING WITH THE COURT YOU DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE YOUR MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE OR KNOW A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
The Allegheny county Bar Association
11th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 261-5555

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| DAVID SCHAFFNER, Jr. and THERESA SUE SCHAFFNER, | ) | Civil Division |
| | ) | |
| | ) | No. GD-19-007729 |
| Plaintiff, | ) | |
| | ) | CIVIL DIVISION DOCKET CODE 004 |
| v. | ) | |
| | ) | |
| MONSANTO CORPORATION | ) | |
| | ) | |
| Defendant. | | |

## COMPLAINT IN CIVIL ACTION

Plaintiffs, David Schaffner, Jr. and Theresa Sue Schaffner, by and through their attorneys, Adrian N. Roe, Esq. and James K. Paulick, Esq. hereby brings this Complaint in Civil Action seeking damages against Defendant Monsanto Corporation (hereinafter "Monsanto"), and in support thereof, alleges as follows:

## BACKGROUND

1.     In approximately 1970, Monsanto developed glyphosate as a herbicide in approximately 1970 and, in approximately 1974, began marketing the herbicide under the brand name "Roundup®." Roundup® is a broad spectrum, non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant polyethoxylated tallow amine ("POEA") and/or adjuvants and other so-called "inert" ingredients. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage*, 2006-2007 Market Estimates 14 (2011), available at http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was also the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are marketed, branded, and sold as Roundup Ready®. The stated advantage of Roundup Ready® crops is that they substantially improve the farmer's ability to control weeds, as the glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybeans grown in the United States were Roundup Ready®.[3]

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

4.      On March 20, 2015, the International Agency for Research on Cancer (hereinafter "IARC"), an agency of the World Health Organization (hereinafter "WHO"), issued an

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at
http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y.TIMES, May
3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-
environment/04weed.html?pagewanted=all
[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), available at
https://monsanto.com/app/uploads/2017/06/back_history.pdf.
[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly
Found in Rain and Streams in the Mississippi River Basin* (2011), available at
https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see also* U.S. Envtl.
Prot. Agency, *Technical Factsheet on: Glyphosate*, available at http://npic.orst.edu/factsheets/glyphogen.html.
[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup
Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at
http://www.sciencedirect.com/science/article/pii/S0308814613019201.
[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family
Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of
Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, 112 IARC Monographs* 76, section 5.4 (2015),
available at http://weedcontrolfreaks.com/wp-content/uploads/2015/03/GlyphosateWHOIARC2ALancetOncology.pdf.
[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at
http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.     On July 29, 2015, the IARC issue the formal monograph relating to glyphosate. In that monograph, the IARC working group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.     The IARC working group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC working group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin lymphoma ("NHL") and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7.     The IARC evaluation is significant. It confirms what some have suspected for years: that glyphosate used in quantities recommended by Monsanto is toxic to humans.

8.     Nevertheless, since it began marketing Roundup®, and notwithstanding its awareness of reliable research to the contrary, Monsanto has represented that Round-up® is safe for humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

9.     This pattern of conduct resulted in the injuries suffered by Plaintiffs and claimed by thousands of others in litigation pending in courts around the United States including in the consolidated litigation, *In re: Roundup® Products Liability Litigation,* MDL No. 2741-VC (N.D.

---

[9] See Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

Cal).[10]

## PARTIES, JURISDICTION AND, VENUE

10.   Plaintiff David Schaffner, Jr. (hereinafter "Schaffner"), is a resident of Allegheny County, Pennsylvania.  He was exposed to Roundup® as a professional landscaper and property owner in and around Butler and Allegheny Counties, Pennsylvania beginning in 1988 until approximately September 2017.   Schaffner was diagnosed with stage 1A/2 Type B Non-Hodgkins Lymphoma in 2006.

11.   Plaintiff Theresa Sue Schaffner is resident of Allegheny County, Pennsylvania, and is the spouse of Plaintiff Schaffner. Mrs. Schaffner suffered loss of consortium due to the damages suffered by and inflicted upon plaintiff Schaffner.

12.   Defendant Monsanto is a corporation created under the laws of the State of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

13.   This Court has general personal jurisdiction over Monsanto because Monsanto regularly transacts business in Pennsylvania and is a corporation registered to do business in Pennsylvania.

14.   The Court also has specific personal jurisdiction over Monsanto because Monsanto knew or should have known that its Roundup® products were being marketed throughout the Commonwealth of Pennsylvania and, if toxic, would likely cause injury to Pennsylvania residents during the period of Schaffner's exposure.

15.   Monsanto maintains sufficient contacts with the Commonwealth of Pennsylvania such that this Court's exercise of personal jurisdiction over Monsanto conforms with traditional notions of fair play and substantial justice.

---

[10] The allegations of this Complaint with the respect to the general characteristics of Roundup® and the history of its development and marketing are based on a review of court orders, pleadings, and other documents filed in the above-referenced multidistrict litigation.

16.    Venue is proper in Allegheny County because both Plaintiffs reside in Allegheny County and some of the events giving rise to this action happened in or are closely related to this county.

## SCHAFFNER'S EXPOSURE TO ROUND-UP AND UNEXPLAINED ILLNESS

17.    During the period of his exposure to Round-up®, Plaintiff Schaffner was a skilled landscape worker.  Schaffner regularly attended safety training programs and had a private pesticide license issued by the Commonwealth of Pennsylvania.

18.    Schaffner regularly took safety precautions to avoid work-place dangers.  For example, when working with chemicals such as Sevin Orthene that he knew to pose a threat of injury through inhalation, Schaffner regularly wore a professional-quality respirator.

19.    Schaffner obtained state-issued certifications to use hazardous materials under various safety conditions with which he regularly complied.

20.    Schaffner heavily used Roundup® as a professional landscaper and landowner over the course of approximately 28 years (in line with the information disseminated by Monsanto in its marketing program) Schaffner never took any safety precautions when using Roundup® based on his understanding that Roundup® was completely safe and could be used without taking any safety precautions.

21.    Schaffner used Roundup® on a daily basis as the landscaper of a large private estate in Butler County known as Elm Court or "Phillips Mansion" in the City of Butler, Butler County, Pennsylvania from approximately 1988 to 1992.

22.    During that time Roundup® was provided to Schaffner by his employer or was purchased directly by Mr. Schaffner in 80% concentrate form in which two ounces of the product could be converted to 1 gallons of final product.

23.    Schaffner worked for the Audubon Society from 1992 until 1997 where he

continued to purchase and use large amounts of the concentrated formulation of Roundup®.

24.     Schaffner moved to Allegheny County in 1990, and started his own landscaping business in 1995, in which he used Roundup® heavily on all of his jobs that required weed control.

25.     Schaffner regularly followed material safety data sheets and similar product documentation related to the products he used as a landscaper. Based on his review of the documentation and labeling provided by Monsanto, Schaffner assumed Roundup® was safe to be used as prescribed.

26.     Roundup® is still marketed by Monsanto as a safe product.

27.     The "precautionary statements" part of the label of a current container of Roundup® states, "CAUTION: Causes moderate eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling. People and pets may enter treated area after spray has dried.

28.     The precautionary statements mention nothing from international peer-reviewed scientific studies and other studies discussed below.

29.     In 2006, Schaffner was diagnosed with Non-Hodgkin Lymphoma Type B stage 1A/2 at the age of 43.

30.     Schaffner underwent surgery and a course of chemotherapy that lasted for six sessions three weeks apart following his diagnosis. Schaffner's doctors told him that he achieved "remission" approximately two years later in 2008. However, from the date of first being diagnosed with cancer to the date of this Complaint Schaffner and his wife lived (and expect for the foreseeable future) to live in fear of the possibility that Schaffner's cancer will recur.

31.     In all of his consultations and treatments with his physicians and medical staff, Schaffner was only told that everyone has a chance of getting this type of cancer, and it was a

random matter of chance that he developed it.

32.     Schaffner did not and (as a result of the marketing activities of Monsanto as discussed herein) had no reason to develop any suspicious belief that his cancer could have been caused by exposure to Roundup®.

33.     It was not until the late summer of 2017, while spraying Roundup® on a rented property, that he became suspicious of the product when his tenants expressed concern to him that he was using Roundup®.

34.     At that time, Schaffner began to do online research and decided to stop using the product completely, and suspected for the first time that the cancer for which he underwent surgery and chemotherapy was caused by his regular exposure to Roundup® in his daily job duties.

35.     As a result of his Roundup®-related injuries, Schaffner has incurred significant economic and non-economic damages.

36.     As a result of his injuries and damages, Mr. Schaffner's wife has incurred significant economic and non-economic damages in the form of loss of consortium and comfort.

## MONSANTO'S DEVELOPMENT AND MARKETING OF ROUNDUP®

37.     When Monsanto first commercially introduced Roundup®, it touted glyphosate as a technological breakthrough in that it could kill almost every weed without causing harm either to people or the environment. In recent years, evidence has emerged showing that Monsanto knowingly disseminated false and misleading information regarding the safety hazards posed by Roundup® and attacked legitimate studies that revealed Roundup®'s dangers. Simply stated, Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers, landscapers and the general population that Roundup® is safe.

### Discovery of Glyphosate and Development of Roundup®

38.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®.[11] Monsanto marketed Roundup® from the outset as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[12]

39.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggest that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

40.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (hereinafter alternatively "FIFRA" or "Act"), 7 U.S.C. § 136, *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency (hereinafter alternatively "EPA" or "Agency") prior to their distribution, sale, or use, excepts as described by the Act. 7 U.S.C. § 136a(a).

41.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target

---

[11] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.
[12] Monsanto, *Glyphosate and Roundup Brand Herbicides* (May 16, 2017), available at https://monsanto.com/company/media/statements/glyphosate-herbicide/.

organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

42.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136b(b). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

43.     The EPA and the Commonwealth of Pennsylvania registered Roundup® for manufacture distribution, and sale.

44.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

45.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

46.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

47.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances." [13]

48.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

49.     In the first instance, in seeking initial registration of Roundup® by the EPA, Monsanto, hired Industrial Bio-Test laboratories (hereinafter "IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup®.

---

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300- 1991-10-30a.pdf.

[14] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf

50.     In 1976, the United States Food and Drug Administration (hereinafter "FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to by invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

51.     Three top executives of IBT were convicted of fraud in 1983. New York Times, May 16, 1983, Section A, Page 18.

52.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

53.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

**The Importance of Roundup® to Monsanto's Market Dominance Profits**

54.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

---

[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.* Washington, D.C. (August 9, 1978)).

[17] https://pubs.acs.org/subscribe/archive/tcaw/10/i11/html/11regs.html

agricultural division was out-performing its chemical division's operating income, and the gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

55.    In response, Monsanto began the development and sale of genetically engineered Roundup® Ready seeds in 1996. As Roundup® Ready crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready seeds, thereby securing Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready® seeds with continued sales of its Roundup® herbicide.

56.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup® Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of 5 to 1, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

## Monsanto Has Known for Decades That It Falsely Advertises the Safety of Roundup®

57.    In 1996, the New York Attorney General (hereinafter "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on

---

[18] David Barboza, *The Power of Roundup®; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-Roundup®®®- a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a. "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks, and fences…"

b. "And remember that Roundup® is biodegradable and won't buildup in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging, or trimming problem."

c. "Roundup® biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It…stays where you apply it."

f. You can apply Roundup® with 'confidence because it will stay where you put it' it binds tightly to spoil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

j. "Roundup® can be used where kids and pets will play and breaks down into natural material." "This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[19]

58.     On November 19, 1996 Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

a. its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate containing pesticide products or any component thereof manufactured, formulated, distributed by Monsanto are biodegradable.

c. its glyphosate containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

---

[19] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

    d.  its glyphosate containing pesticides products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.  glyphosate containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f.  its glyphosate containing products or any component thereof might be classified as "practically non-toxic."

59.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so as of today.

60.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### Classification and Assessments of Glyphosate

61.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined that 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and 1 agent to be Probably Not Carcinogenic.

62.    The established procedure for IARC Monograph evaluations is described in the

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

IARC Programme's Preamble.[21] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

63.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lance Oncology*, and within a year after the meeting, the finalized Monograph is published.

64.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

65.     In March 2015, the IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

66.     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at the IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.

---

[21] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

The March meeting culminated an almost year-long review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

67.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

68.    Glyphosate was identified as the second most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

69.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater as well as food.

70.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

71.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

72.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

73.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study report a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skim tumors in an initiation promotion study in mice.

74.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

75.    The IARC Working Group further found that glyphosate and glyphosate formations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

76.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

77.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[23] While this study differed from other in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

78.    The EPA published a technical fact sheet as part of its Drinking Water and Health,

---

[22] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

[23] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

National Primary Drinking Water Regulations publication relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[24]

79.    In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, that state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[25]

---

[24] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

[25] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

### Toxicity of Other Ingredients in Roundup®

80.     In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[26]

81.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[27]

82.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[28]

83.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup®® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other

---

[26] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[27] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[28] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[29]

84.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[30]

85.    The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone, and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect David Schaffner from Roundup®.

86.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

### G.    Recent Worldwide Bans on Roundup®/Glyphosate

87.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the

---

[29] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.
[30] Nora Benachour, et al., Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides, including Roundup®, in April 2014, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[31]

88.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[32]

89.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[33]

90.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out be a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."[34]

91.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural

---

[31] *Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda,* April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[32] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link,* GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following- recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional,* April 14, 2015, available at http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[33] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen",* NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it- probable-343311.
[34] *Health Minister: Importation of Roundup Weed Spray Suspended,* Today in Bermuda, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.

workers.[35]

92.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[36]

93.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. [37] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[38] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[39]

94.    The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

---

[35] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse*, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban- on-glyphosate-herbicides/.

[36] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

[37] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion- malathion-glyphosate.

[38] *Frequently Asked Questions*, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.

[39] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion- malathion-glyphosate.

95. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[40] The law also prohibits the discharge of listed chemicals into drinking water.

96. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[41]

97. Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[42] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[43] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.[44]

98. On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal

---

[40] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[41] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al.*, No. 16-CECG-00183 (Cal. Super. Ct.), available at
https://www.schiffhardin.com/Templates/media/files/Other%20PDFs/Monsanto_petition.pdf.
[42] *Id.* at 2.
[43] *Id.* at 3.
[44] *Id.*

Assessment Report ("RAR") on glyphosate. [45] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

99.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

100.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[46] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans

101.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals. [47] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[48] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or

---

[45]

[46] *Id.*

[47] *EFSA Fact Sheet: Glyphosate*, EFSA, available at
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112e n.pdf.

[48] *Id.*

environmental exposure, and cultural or behavioral practices."[49] The EFSA accorded greater

weight to studies conducted with glyphosate alone than studies of formulated products.[50]

102.   The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations
> may be genotoxic (i.e. damaging to DNA), other that look solely at the active
> substance glyphosate do not show this effect. It is likely, therefore, that the
> **genotoxic effects observed in some glyphosate-based formulations are related**
> **to the other constituents or "co-formulants."** Similarly, certain glyphosate-
> based formulations display higher toxicity than that of the active ingredient,
> presumably because of the presence of co-formulants. In its assessment, the
> **EFSA proposes that the toxicity of each pesticide formulation and in**
> **particular its genotoxic potential should be further considered and addressed**
> **by Member State authorities while they re- assess used of glyphosate-based**
> **formulations in their own territories.**[51] **(Emphasis added).**

103.   Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate.

Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight

per day; an acute reference dose ("ARfD) of 0.5 mg/kg of body weight; and an acceptable operator

exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[52]

### Leading Scientists Dispute the EFSA's Conclusion

104.   On November 27, 2015, ninety-six (96) independent academic and governmental

scientists from around the world submitted an open letter to the EU health commissioner, Vytenis

---

[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

Andriukaitis.[53] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[54]

105. Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

106. In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why that IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[55]

107. With respect to human data, the scientists pointed out that the EFSA agreed with

---

[53] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.
[54] Id.
[55] Id.

the IARC that there was "*limited evidence* of carcinogenicity" for Non-Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence." [56]

108.   Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only single study used the same mouse strain as the historian controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in

---

[56] *Id.*

seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[57]

109.   The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[58]

110.   On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[59]

### Statement of Concern Regarding Glyphosate-Based Herbicides

111.   On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks

---

[57] *Id.*

[58] *Id.*

[59] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Marc. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.

associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[60] The paper's "…focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[61] The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolics are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[62]

112.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[63]

113.   The paper attributed uncertainties in current assessments of glyphosate

---

[60] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[61] *Id.*

[62] *Id.*

[63] *Id.*

formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[64]

114.   Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[65]

115.   The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[66]

116.   The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

---

[64] *Id.*
[65] *Id.*
[66] *Id.*

> [A] fresh and independent examination of GBH toxicity
> should be undertaken, and ... this reexamination be
> accompanied by systemic efforts by relevant agencies to
> monitor GBH levels in people and in the food supply, none of
> which are occurring today. The U.S. National Toxicology
> Program should prioritize a thorough toxicology assessment
> of the multiple pathways now identified as potentially
> vulnerable of GBHs.[67]

117.   The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs
> provide funds to the appropriate regulatory body as part of routine registration actions
> and fees. Such finds should then be transferred to appropriate government research
> institutes, or to an agency experienced in the award of competitive grants. In either case,
> funds would be made available to independent scientists to conduct the appropriate long-
> term (minimum 2 years) safety studies in recognized animal model systems. A thorough
> and modern assessment of GBH toxicity will encompass potential endocrine disruption,
> impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a
> reproductive capability and frequency of birth defects.[68]

---

[67] *Id.*
[68] *Id.*

## The FDA Announces Testing of Glyphosate Residue in Foods

118. On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[69]

119. In 2004, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[70]

120. Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[71]

121. The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[72]

## European Union Vote on Glyphosate Renewal

122. The license for glyphosate in the European Union was set to expire in June 2016.

123. Without extension of the license, Monsanto's Roundup®® and other glyphosate-

---

[69] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[70] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at http://www.gao.gov/products/GAO-15-38.

[71] Gilliam, *supra* note 68.

[72] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, available at https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm

based herbicides faced a general phase out in EU markets.[73]

124. In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

125. For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[74] The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[75]

126. The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[76] Leading up to the vote, Italy joined the other EU states in opposing licensing renewal, citing health concerns.[77]

127. On June 6, 2016, the Member States votes but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[78]

128. On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the

---

[73] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, available at http://www.reuters.com/article/us-health- eu-glyphosate-idUSKCN0ZE25B.

[74] Arthur Neslen, *EU States rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu- states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[75] *Id.*

[76] Arthur Neslen, *Vote on controversial weedkiller's European license postponed*, THE GUARDIAN, Mar. 8, 2016, available at https://www.theguardian.com/environment/2016/mar/08/eu- vote-on-controversial-weedkiller-licence-postponed-glyphosate.

[77] *Id.*

[78] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate- licence-by-18-months/.

chemical, which is expected by the end of 2017.[79]

129.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate-based herbicides, including Roundup®.[80]

130.   On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[81]

### David Schaffner's Exposure to Roundup

### TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

131.   Plaintiff David Schaffner had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate.

132.   Plaintiff David Schaffner never developed any subjective belief that Roundup® could have caused his cancer until the anecdotal and offhand comment from his tenants in the late summer of 2017.

133.   Plaintiff David Schaffner never discussed any link between Roundup® and cancer or performed any research of any link between Roundup® and Cancer prior late summer of 2017.

134.   Plaintiff David Schaffner was never made aware of any international studies from IARC or WHO on glyphosate or Roundup® or any herbicides and any links between them an any illnesses whatsoever.  Moreover, Schaffner has not had access to information produced in *In re:*

---

[79] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes- immediate-ban.
[80] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate- coformulant/
[81] Caterina Tano, *German vote swings EU decision on 5-year glyphosate renewal*, November 27, 2016, available at https://euobserver.com/environment/140042

*Roundup® Products Liability Litigation,* MDL No. 2741-VC (N.D. Cal.), which information may have contributed to the several decisions upholding punitive damages verdicts in cases tried before that court.

135.   Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

136.   Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and glyphosate would have caused his illness.

137.   For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claim.

### Fraudulent Concealment Tolling

138.   All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

139.   Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

140.   Monsanto continues to this day of the filing of this complaint to market and sell the Roundup® product with no warnings that the vast majority of the world's scientific community has concluded that there is a link between Roundup®'s constituent agents cause the very cancer that he was diagnosed with in 2006.

141.   Because Monsanto as an entity continues to claim its product's safety, Monsanto cannot assert any applicable statute of limitation because from Monsanto's perspective, nobody

can "know" of the harmful effects of Roundup® because Monsanto still asserts and advertises that the product is safe.

## Estoppel

142.   Monsanto was under a continuous duty to disclose to consumer, users, and other persons coming into contact with its products, including Plaintiff David Schaffner, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

143.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks with the use of and/or exposure to its products.

144.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I – STRICT LIABILITY (DESIGN DEFECT)

145.   Plaintiff David Schaffner re-alleges paragraphs 1 through 144 above as if fully set forth herein.

146.   Plaintiff brings this strict liability claim against Defendant for defective design.

147.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including David Schaffner, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

148.   At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed,

sold and distributed the Roundup® products used by David Schaffner and/or to which David Schaffner was exposed, as described above.

149.  At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, David Schaffner.

150.  At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including David Schaffner without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

151.  Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

152.  Defendant's Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

153.  Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed,

sold, and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

    a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;

    b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner;

    c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.  Defendant did not sufficiently test, investigate, or study its Roundup®® products and, specifically, the active ingredient glyphosate;

    e.  Exposure to Roundup® and the glyphosate containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

    f.  Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, as well as the combination of glyphosate and other chemicals contained in Roundup®, could result in cancer and other severe illness and injuries;

    g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup® products;

h.  Defendant could have employed safer alternative designs and formulations.

154.  At all times relevant to this litigation, David Schaffner used and/or was exposed to the use of Defendant's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

155.  David Schaffner could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at time of exposure.

156.  The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.

157.  Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

158.  At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

159.  In light of Defendant's knowledge as alleged herein, Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

160.  Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

161.  The defects in Defendant's Roundup® products were substantial and contributing factors in causing David Schaffner's grave injuries, and but for Defendant's misconduct and omissions, Mr. Schaffner would not have sustained his injuries.

162. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Schaffner developed Type B Non-Hodgkin's Lymphoma, and suffered grave injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

163. As a direct and proximate result of the Non-Hodgkin's Lymphoma diagnosis of David Schaffner, his family members have suffered sorrow, mental anguish, loss of solace, which includes deprivation of society, companionship, guidance, kindly offices and advice of David Schaffner; loss of services, protection, and care and assistance provided by David Schaffner; and reasonable medical expenses, all to their damage.

WHEREFORE, Plaintiff Schaffner respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other costs and further relief as this Court deems just and proper.

## COUNT II – STRICT LIABILITY (FAILURE TO WARN)

164. Plaintiff David Schaffner re-alleges paragraphs 1 through 163 above as if fully set forth herein.

165. Plaintiff brings this strict liability claim against Defendant for failure to warn.

166. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®, which are defective and unreasonably dangerous to consumers, including David Schaffner, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate and the "inert ingredients" alleged herein. These actions were under the ultimate control and supervision of Defendant.

167. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Schaffner, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

168. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonably and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

169. At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

170. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including David Schaffner.

171. Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics

of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product and not known to end users and consumers, such as David Schaffner.

172. Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

173. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with the products thorough the United States, including David Schaffner without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

174. At all times relevant to this litigation, David Schaffner used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

175. David Schaffner could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at the time of his exposure. Mr. Schaffner relied upon the skill, superior knowledge, and judgment of Defendant, and in particular, the products labeling, which did not mention that serious illnesses, such as Non-Hodgkin's Lymphoma could result from exposure to Defendant's Roundup® product.

176. Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

177. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

178. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and/or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

179. To this day, Defendant has failed to adequately and accurately warn of the true risks of David Schaffner's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

180. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by David Schaffner.

181. Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risk associated with the use of or exposure to

Roundup® and glyphosate.

182. The defects in Defendant's Roundup® products were substantial and contributing factors in causing David Schaffner's injuries, and, but for Defendant's misconduct and omissions, Mr. Schaffner would not have sustained his injuries.

183. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risk associated with its Roundup® products, David Schaffner could have avoided the risk of developing injuries as alleged herein and Mr. Schaffner could have obtained alternative herbicides.

184. As a direct and proximate result of Defendant placing its defective Roundup® products into the steam of commerce, David Schaffner developed Non-Hodgkin's Lymphoma and suffered grave injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, as well as hardship inflicted upon his spouse and children.

185. As a direct and proximate result of the Non-Hodgkin's Lymphoma diagnosis of David Schaffner, his family members have suffered sorrow, mental anguish, loss of solace, which includes deprivation of society, companionship, guidance, kindly offices and advice of David Schaffner; loss of services, protection, and care and assistance provided by David Schaffner; and reasonable medical expenses, all to their damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III - NEGLIGENCE

186. Schaffner re-alleges paragraphs 1 through 185 above as if fully set forth herein.

187. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

188. Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by David Schaffner.

189. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

190. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products, Defendant's duty of care owed to consumer and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

191. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

192. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use or exposure to its Roundup® products could cause David Schaffner's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including David Schaffner, the Plaintiff.

193. Defendant knew or, in the exercise of reasonable care, should have known that

Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect David Schaffner from Roundup®.

194.   Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

195.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

196.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

197.   Defendant failed to appropriately and adequately test Roundup®, Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect David Schaffner from Roundup®.

198.   Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

199. Defendant's negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

    d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

    e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

    f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h. Failing to disclose to Schaffner, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Schaffner, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Mr. Schaffner and other users or consumers;

j. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k. Representing that its Roundup® products were safe for their intended use when in fact, Defendant knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risk of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by defendant to be associated with or caused by the use of and exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

200. Further, Monsanto under-reported, underestimated, and downplayed the serious dangers of its Roundup® products. Specifically, Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt and other available forms of herbicides.

201. Defendant knew or should have known that it was foreseeable that consumers and/or users, such as Schaffner, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale from Roundup®.

202. Schaffner did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

203. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that David Schaffner suffered, as described herein.

204. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including David Schaffner, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Schaffner. Defendant's reckless conduct therefore warrants an award of punitive damages.

205. As a proximate result of Defendant's wrongful acts and omission in placing its defective Roundup® products into the steam of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, David Schaffner developed Non-Hodgkin's

Lymphoma and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

206. As a direct and proximate result of the Non-Hodgkin's Lymphoma diagnosis of David Schaffner, his family members have suffered sorrow, mental anguish, loss of solace, which includes deprivation of society, companionship, guidance, kindly offices and advice of David Schaffner; loss of services, protection, and care and assistance provided by David Schaffner; and reasonable medical expenses, all to their damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT IV – BREACH OF EXPRESS WARRANTY

207. Plaintiff of David Schaffner re-alleges paragraphs 1 through 206 above as if fully set forth herein.

208. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including David Schaffner thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

209. Defendant had a duty to exercise reasonable care in the researching, testing, development, design, licensing, formulation, manufacture, inspection, production, assembly, packaging, labeling, advertising, promotion, marketing, selling, supply, distribution, and release of its Roundup® products, including a duty to:

a. Ensure that its products did not cause the user unreasonably dangerous side effect

b. Warn of dangerous and potentially fatal side effects; and

c. Disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate containing products, when making representations to consumers and the general public, including Schaffner.

210. At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended doe consumers and the general public, that is Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

211. At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended doe consumers and the general public, that is Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

212. These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew or should have known that the risks expressly

included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Schaffner, and/or that they were safe and effective as agricultural herbicides.

213.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

214.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

215.   Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

   a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

   b.   Defendant represented that its Roundup® products were safe for use and

fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

216. Schaffner justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and/or use of its Roundup® products. When Schaffner made the decision to purchase and/or use Roundup®, he reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® products and glyphosate.

217. Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Schaffner could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

218. Schaffner had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

219. Schaffner used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

220. Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Schaffner's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Schaffner could have avoided the injuries complained of herein.

221. As a direct and proximate result of Defendant's wrongful acts and omissions, Schaffner suffered severe injuries. Mr. Schaffner developed Non-Hodgkin's Lymphoma and suffered grave injuries, physical pain and mental anguish, including diminished enjoyment of

life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

222.   As a direct and proximate result of the Non-Hodgkin's Lymphoma diagnosis of Schaffner, his family members have suffered sorrow, mental anguish, loss of solace, which includes deprivation of society, companionship, guidance, kindly offices and advice of Schaffner; loss of services, protection, and care and assistance provided by Schaffner; and reasonable medical expenses, all to their damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT V – BREACH OF IMPLIED WARRANTY

223.   Plaintiff Schaffner re-alleges paragraphs 1 through 222 above as if fully set forth herein.

224.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including David Schaffner, thereby placing Roundup® products into the stream of commerce.

225.   These actions were under the ultimate control and supervision of Defendant.

226.   Before the time that Schaffner was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Schaffner, that its Roundup® products were of merchantable quality and safe and fit for the use

for which they were intended; specifically, as horticultural herbicides.

227. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including type B Non-Hodgkin's Lymphoma injuries. Roundup® products were and are provided to consumers/users, such as Schaffner, in a dangerously defective and unsafe condition.

228. Schaffner was the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such, Plaintiff Schaffner is entitled to assert this claim.

229. Schaffner reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality for their intended purpose or use.

230. The Roundup® products were expected to reach and did in fact reach consumers and users, including Schaffner, without substantial change in the condition in which they were manufactured and sold by Defendant.

231. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Schaffner, would use Roundup® products as marketed by Defendant, which is to say that Schaffner was the foreseeable user of Roundup®, particularly since Mr. Schaffner was in the business of landscaping and horticulture for almost three decades.

232. Defendant intended that its Roundup® products be used in the manner in which Schaffner in fact used them, and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

233. In reliance upon Defendant's implied warranty, Schaffner used Roundup® as

instructed and labeled and in the foreseeable manner intended, recommended promoted, and marketed by Defendant.

234. Schaffner could not have reasonably discovered or known of the risk of serious injury associated with Roundup® or glyphosate.

235. Defendant breached its implied warranty to Schaffner in that its Roundup® products were not of merchantable quality, safe, or fit for their intended purposes and/or uses, nor adequately tested. Instead, the Roundup® products were in a dangerously defective and unsafe condition. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

236. The harm caused by Defendant's Roundup® products far outweighed their benefit, rending the products more dangerous than an ordinary customer or user would expect and more dangerous than alternative products.

237. As a direct and proximate result of Defendant's wrongful acts and omissions Schaffner suffered severe physical and emotional injuries. Schaffner developed Type B Non-Hodgkin's Lymphoma and suffered grave injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

238. As a direct and proximate result of the Non-Hodgkin's Lymphoma diagnosis of Schaffner, his family members have suffered sorrow, mental anguish, loss of solace, which includes deprivation of society, companionship, guidance, kindly offices and advice of Schaffner; loss of services, protection, and care and assistance provided by David Schaffner; and reasonable medical expenses, all to their damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT VI – NEGLIGENT MISREPRESENTATION AND/OR FRAUD

239. Plaintiff David Schaffner re-alleges paragraphs 1 through 238 above as if fully set forth herein.

240. Defendant is the designer, researcher, developer, manufacturer, tester, packager, promoter, marketer, advertiser, distributor, labeler, supplier, and/or seller of Roundup® and, while engaged in the course of such business, made representations to consumers, including Mr. Schaffner, regarding the character and/or quality for guidance in the decision to select Roundup® for use.

241. Defendant had a duty to disclose material information about serious health effects to consumers such as Mr. Schaffner. Defendant negligently, recklessly, and/or intentionally failed to disclose this information for the purpose of inducing consumers, including Mr. Schaffner, to purchase Defendant's dangerous products.

242. Specifically, Defendant's advertisement regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing customers, such as Mr. Schaffner, to purchase said product. Defendant further misrepresented that its products were just as safe and just as effective or more effective, than other weed control products on the market.

243. Defendant's representations regarding the character or quality of Roundup® were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

244. Defendant had actual knowledge based on the results of trials, tests, and studies of

exposure to glyphosate of the risk of serious harm associated with human use and exposure to Roundup®.

245. Defendant negligently and/or intentionally misrepresented or omitted this information from its products labeling, promotions, and advertisements and instead labeled, promoted, and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to customers.

246. In supplying the false information, Defendant failed to exercise a reasonable care or competence in obtaining or communicating information to their intended recipients, including Schaffner.

247. Schaffner reasonably and justifiably relied to his detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Schaffner reasonably and justifiably relied upon Defendant's representations to him that Roundup® was safe for use and that Defendant's labeling, advertisements, and promotions fully described all known risk of the product.

248. As a direct and proximate result Plaintiff's use of Roundup® as manufactured, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Mr. Schaffner developed Type B Non-Hodgkin's Lymphoma and suffered grave injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

249. As a direct and proximate result of the Non-Hodgkin's Lymphoma diagnosis of Schaffner, his family members have suffered sorrow, mental anguish, loss of solace, which includes deprivation of society, companionship, guidance, kindly offices and advice of Schaffner;

loss of services, protection, and care and assistance provided by David Schaffner; and reasonable medical expenses, all to their damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## CONSORTIUM

250.   Plaintiffs allege and incorporate by reference the allegations contained in all of the above paragraphs, as fully as though the same were set forth herein at length.

As a result of the injuries sustained by plaintiff Schaffner due to Defendant's negligence and otherwise tortious conduct, plaintiff Theresa Sue Schaffner has suffered and will continue to suffer all such damages as are allowable as a result of loss of consortium and society as provided by Pennsylvania law.

251.   The sole and proximate cause of the injuries and damages sustained by Plaintiffs were the negligent and fraudulent acts, omissions, and/or conduct of Defendant, as set forth above – including those acts supportive of strict products liability.

WHEREFORE, Plaintiff Theresa Sue Schaffner requests damages from Defendant in an amount in excess of the jurisdictional for mandatory arbitration, exclusive of interests and costs, and Plaintiff Sue Schaffner demands a jury trial on the matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Monsanto, awarding as follows:

A) Compensatory damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damaged in an amount to be proven at trial;

B) Compensatory damages for pain and suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

C) Punitive damages for the wanton, willful, fraudulent, outrageous, and reckless acts of the Defendant which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowable by applicable law;

D) Pre- and post-judgment interest;

E) Loss of Consortium; and

F) Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and;

G) Any other relief that Court may deem just and proper.

Respectfully submitted,

ROE & SIMON LLC

By _____

Adrian N. Roe

LAW OFFICE OF JAMES PAULICK, ESQ.

By _____

James K. Paulick, Esquire

Counsel for Plaintiff

## **VERIFICATION**

I, David Schaffner, Jr., do hereby verify that the statements contained in the

foregoing document are true and correct to the best of my knowledge, information, and

belief. I understand that false statements made herein are subject to the penalties of 18 Pa.

C.S.A. § 4904 relating to unsworn falsification to authorities.

9/12/19
_____
Date

_____
David Schaffner, Jr. Plaintiff

## **VERIFICATION**

I, Theresa Sue Schaffner, do hereby verify that the statements contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

9-11-19
Date

Theresa Sue Schaffner

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Complaint was served by mail, upon all counsel named below this _13th_ day of _September_ 2019:

Shook, Hardy, Bacon L.L.P.
Attn: Joseph H. Blum
Two Commerce Square
2001 Market Street
Suite 3000
Philadelphia, PA 19103

Adrian N. Roe

James K. Paulick

Attorneys for Plaintiff

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Attorney for Plaintiff

Signature:

Name: James K. Paulick, Esquire

Attorney No. (if applicable): 307552

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Attorney for Plaintiff

Signature: _____

Name: Adrian N. Roe, Esquire

Attorney No. (if applicable): 61391